THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELIZABETH BEASLEY, Defendant-Appellant.

First District (5th Division)   No. 76-958

Opinion filed October 21, 1977.

James Geis and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and James V. Marcanti, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

A jury found defendant guilty of voluntary manslaughter,[1] and she was sentenced to a term of three to nine years. On appeal, the following issues were presented: (1) whether she was proved guilty beyond a reasonable doubt; (2) whether the conduct of the trial court denied her a fair trial; (3) whether certain evidence was erroneously admitted and constituted reversible error; and (4) whether her sentence was excessive.

FACTS

It appears undisputed that Willie Mac Hurns, the deceased, and defendant had cohabited for nine years until defendant asked him to leave early in August 1975. He returned frequently to visit their adopted daughter, Lisa, age nine. On the late afternoon of August 28, 1975, Hurns and Myra Henderson, his girl friend, drove to the parking lot of a food store near defendant's home. After parking the vehicle, a pickup truck, Hurns went to defendant's home and, 20 to 30 minutes later, both of them entered the parking lot. Upon reaching Hurns's truck, a .38-caliber derringer in defendant's hand discharged and mortally wounded Hurns.

The preliminary hearing testimony of Myra, who died of unrelated causes, was read. She testified that she observed Hurns approaching the truck, followed by defendant. The latter was carrying a gun and, when Hurns was within one foot of the driver's door, defendant, then about

---

[1] Defendant was indicted for the murder of Willie Mac Hurns and the attempt murder of Myra Henderson but a directed verdict of not guilty was entered on the latter charge.

eight feet away, fired one shot which struck Hurns. Frank Shaw, who observed the incident from another parking lot two doors to the east, testified that seconds before the shot was fired he saw defendant approaching Hurns with a towel in her hand. When defendant came within four to five feet of Hurns, she opened the towel displaying a gun. She then fired the weapon, and Hurns fell to the ground. Hurns's sister, who had lived with defendant for several months prior to the incident, testified that defendant had on previous occasions said she was going to kill Hurns.

Defendant, to the contrary, testified that when Hurns arrived at her home an argument ensued concerning the ownership of garments which Hurns thought to be male clothing. Hurns struck her and then pulled her from the house, insisting that she apologize to Myra for remarks uttered on a previous visit. Defendant protested but was forcefully pulled into the back yard, where Hurns picked up a brick with which he threatened her and, in fact, struck her with the brick three or four times about the neck and shoulder on the way to the truck. In the meanwhile, their daughter Lisa asked him to stop hitting her mother; whereupon, he told Lisa to go home. Lisa complied but returned with Hurns's gun wrapped in a handkerchief and handed it to her mother, who was aware that a gun was within the handkerchief. Then, as she and Hurns neared the truck, he hit her once more—knocking her against the truck, which caused the gun to discharge. She said it was still in the handkerchief when it went off. Her finger was not on the trigger, and she didn't know whether it was cocked when it was handed to her. At the coroner's inquest, however, her testimony differed in that she said after she was knocked against the truck and turned around to go back he hit her again, when her back "began jerking" and "the gun went off." At trial and at the coroner's inquest, she testified that she did not intend to fire the weapon. Other witnesses testified at trial that a common house brick and a .38-caliber derringer were found near Hurns's body.

Agnes Green, a defense witness, testified that while walking through the alley separating defendant's back yard and the parking lot, she observed Hurns and defendant fighting. As he pushed defendant into the parking lot toward a parked truck, Green saw him hit her six or seven times with a brick. Ms. Green also observed a little girl carrying a towel step in between them and then leave. When Hurns and defendant reached the truck, he shoved her against it, and the gun discharged.

The State and defense each presented expert testimony concerning whether defendant was injured during the incident and as to the likelihood of the accidental discharge of the weapon in question. Dr. Geis of the Loyola Medical Center testified that defendant complained of pain in her neck and shoulder on the evening of August 29, but that neither his

examination or the X rays taken of her revealed any objective signs of trauma or any straightening of the curvature of the spine in the area of the neck. Dr. Zeitlin, called by the defense, testified that the X rays showed an abnormal straightening of the spine in the area of the neck. He further testified that when rotation of the neck is painful, the muscles will spasm to hold the neck in a stiffened position, thus straightening the natural curvature of the spine in that area. In his opinion, this straightening could have resulted from a blow to the neck and shoulder area with a brick. He could not, however, offer an opinion as to how long the condition had existed but stated it could have been more than 24 hours.

Regarding the likelihood of the accidental firing of the gun, David Brundage, a firearms examiner for the State of Illinois, testified that it could only be fired when the hammer was drawn back to a fully cocked position and pressure is applied to the trigger. He found that the gun was in good working order, and he tested it by fully cocking the hammer and jarring the top, bottom and sides of the weapon and also by hitting the back of the hammer itself. At no time during this testing procedure did the gun discharge. Paul Haberly, a gunsmith testifying for the defense, stated that the derringer was a dangerous weapon because it could accidentally discharge. He said, however, that this could occur if it was jarred while it is being loaded or if dropped when fully cocked. Haberly did not test the gun in question to determine under what conditions it might accidentally discharge but said that forward pressure must be applied to a fully cocked hammer before it could happen.

During cross-examination, defendant admitted that she had been in an automobile accident in February 1975, and the fact that she and her three passengers went to the hospital on the advice of the police. In rebuttal, Catherine Ferris, one of those passengers, testified that defendant complained of a head injury and, on the following day, she observed that defendant had a black eye. The parties stipulated that at the hospital on this occasion X rays were taken only of her head.

Discussion

Defendant first contends that she was not proved guilty beyond a reasonable doubt, because her testimony of an accidental shooting was corroborated by an impartial witness (Green) and by the testimony that a brick, a towel, and a gun were found in close proximity to Hurns's body; whereas, she argues that the State's evidence consisted of the testimony of witnesses who either did not have an adequate opportunity to observe the incident or were suspect because of their relationship with the deceased.

■■ Weight of evidence and credibility of witnesses are questions for the jury to resolve (*People v. Therriault* (1976), 42 Ill. App. 3d 876, 356

N.E.2d 999), and a court of review will not set aside its determination unless the evidence is so unsatisfactory as to leave a reasonable doubt of guilt (*People v. Hood* (1974), 59 Ill. 2d 315, 319 N.E.2d 802; *People v. Houck* (1977), 50 Ill. App. 3d 274, 365 N.E.2d 576). Conflicts or discrepancies in testimony go only to the weight to be given to the testimony (*People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369), and the trier of fact may believe as much or as little as it pleases of a witness's testimony (*People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345). Moreover, friendship with the deceased of itself does not destroy the credibility of the State's witnesses. *People v. Myrick* (1969), 106 Ill. App. 2d 88, 245 N.E.2d 585.

Here, defendant was observed by Frank Shaw and Myra Henderson following deceased with a gun in her hand and moments later was seen firing it at him. While Shaw, as argued by defendant, made conflicting estimates of the distance separating him from the shooting site, he readily identified his position when shown a photograph of the scene and in other respects gave clear and positive testimony. This photograph was made part of the record and reveals that his view of the incident was unobstructed. We believe that Henderson's testimony was also clear and positive in character, and it appears that the jury was fully informed of her relationship with the deceased. In addition, there was testimony that on prior occasions defendant said she was going to kill Hurns and that, when arrested that evening, defendant said to the officer, "I told him not to bring that woman by my house."

Defendant testified at the coroner's inquest that after she was knocked into the truck by Hurns, she turned around and started back when Hurns hit her again. This caused her back to begin "jerking," and the gun went off. Her trial testimony, in contradistinction, was that the gun accidentally discharged when she was knocked against the truck. She did not know whether the gun was in a fully cocked position when it was handed to her but, even if it were, we note that the tests by Brundage, which involved striking the hammer of the gun when fully cocked, did not result in a discharge. Defendant's witness (Haberly), although he generally viewed a derringer to be a dangerous weapon, stated that the only situations where accidental discharge could result were during the loading process and when the gun is dropped while in a fully cocked position—neither of which was involved here. Moreover, while Agnes Green's testimony tended to corroborate defendant's trial version of the incident, her testimony was interlaced with vagueness. At one point, she denied having observed deceased and defendant at the time the shot was fired. Although she retracted that denial, she could not identify the photograph of the truck and parking lot; her only clear remembrance was of a trash can next to which she had parked. Furthermore, after the shooting she said she

"ran from there," returning about 30 minutes later, at which time she said there were no police cars or officers at the scene. Police officers and others testified to the contrary, and photographs showed the presence at that time of officers and police vehicles. We think it significant also that, although defendant and Ms. Green said Hurns struck defendant with a brick many times, the doctor who examined defendant found no objective signs of injury to the parts of her body she and Green said were struck by defendant.

■■ ■ Under the circumstances, it cannot be said that the jury was obliged to believe defendant's statement that the shooting was accidental (see *People v. Kelley* (1963), 29 Ill. 2d 53, 193 N.E.2d 21) or that the evidence was so unsatisfactory as to leave a reasonable doubt of guilt (see *People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126; *Myrick*).

Defendant next contends that the conduct of the trial court denied her a fair trial. She argues that the jury was prejudiced when the court, in a preliminary statement, said, "I believe that the testimony will be that she shot one man who died and attempted to shoot someone else." She asserts further prejudice resulted later, when the court twice chastised defense counsel during the course of the trial.

■■ Where no objection is made to remarks of the court and no question is raised as to them in the post-trial motion, any error is deemed to be waived. (*People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389.) In the instant case, defendant made no objection to any of the alleged improper conduct nor were they specified as error in her post-trial motion. Nevertheless, she argues that they should be reviewed as plain error under Supreme Court Rule 615(a). Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

■■ This rule has been interpreted in *People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403, 405, as permitting a reviewing court "to take notice of errors appearing upon the record which deprive the accused of substantial means of enjoying a fair and impartial trial and in criminal cases in which the evidence is closely balanced to consider errors that have not been properly preserved." To invoke the plain error rule, defendant must establish that the errors complained of were so prejudicial as to clearly deny his right to a fair trial. *People v. Macklin* (1976), 37 Ill. App. 3d 100, 345 N.E.2d 181. See also *People v. Mays* (1971), 48 Ill. 2d 164, 269 N.E.2d 281; *People v. Nurse* (1975), 34 Ill. App. 3d 42, 339 N.E.2d 328.

Here, while we believe the preliminary statement of the court to the prospective jurors was injudicious, we do not think defendant was prejudiced by it. The statement was made before the voir dire examination, and we are unable to determine from the record whether any of the jurors who heard the statement were actually impaneled. It

being a murder indictment, it is possible, albeit not probable, that none were selected to serve. In any event, it does appear that at the close of the case, a cautionary instruction was given as follows:

> "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be."

In *People v. Parra* (1975), 35 Ill. App. 3d 240, 340 N.E.2d 636, where a similar instruction was given, the court held it to be curative in the absence of any indication that the jury disregarded the instruction. Defendant does not contend, nor does the record disclose, that the jury disregarded this instruction and, under the reasoning of *Parra,* we consider it as rendering harmless any error in the preliminary remark of the court.

Concerning the alleged chastisements of defense counsel, which defendant contends are additional indications that she was deprived of a fair trial, we note that the first arose when the State's objection was sustained to a question seeking a hearsay response. The witness nonetheless volunteered the information and defense counsel, in emphasizing the response, characterized it in a light favorable to defendant beyond the actual wording of the response. After an objection by the State and further colloquy, the trial court commented to defense counsel to the effect that he knew better than to so act. The second incident occurred when the trial court ordered defense counsel to cease arguing about a matter not in evidence and concerning which the court had previously ruled to be an improper subject of argument.

These are the only two occasions mentioned by defendant, and from our examination of the record we consider each to have been the result of the actions of defense counsel. Statements which express impatience or hostility toward defense counsel do not amount to reversible error where they are either invited or provoked by such counsel. See *People v. Sleezer* (1956), 9 Ill. 2d 57, 136 N.E.2d 808; *People v. Westrup* (1939), 372 Ill. 517, 25 N.E.2d 16, *cert. denied* (1940), 310 U.S. 642, 84 L. Ed. 1411, 60 S. Ct. 1089.

■■ Here, the chastisements of counsel do not approach the frequency or intensity of the conduct reflected in the cases cited by defendant (*Kelley; People v. Lewerenz* (1962), 24 Ill. 2d 295, 181 N.E.2d 99) and, as the responses complained of were invited by the conduct of defense counsel, they do not constitute reversible error. Moreover, the record is otherwise replete with incidents wherein it appears the court was cordial and helpful to the defense. Thus, whether the alleged improper conduct of the court is considered separately or cumulatively, we do not believe that they deprived defendant of a fair trial.

■■ Next, defendant contends that certain rebuttal testimony of Catherine Ferris was erroneously admitted, as no foundation for its

introduction had been laid during the cross-examination of defendant. The State argues that this issue was not included in the post-trial motion and was therefore waived. We note, however, that the rule of waiver has been relaxed when an issue not specified in a post-trial motion had, as here, been brought to the attention of and ruled upon by the trial court and fundamental fairness requires that it be reviewed. *People v. Hamby* (1965), 32 Ill. 2d 291, 205 N.E.2d 456; *People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462.

■■■ A witness may be impeached by a prior inconsistent statement if he or she has been alerted to it by the laying of a foundation during cross-examination. (*People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178.) The foundation is properly laid where the witness is apprised of the time, place and persons involved and asked whether such a statement was made. (*People v. Byers* (1973), 11 Ill. App. 3d 277, 296 N.E.2d 621.) The purpose of this rule is to avoid unfair surprise and afford an opportunity to explain. (*People v. Payton* (1966), 72 Ill. App. 2d 240, 218 N.E.2d 518.) However, the conventional method of establishing an adequate foundation for a prior inconsistent statement need not be rigidly applied where the reasons for the rule are substantially satisfied. (*People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) Thus, where the witness has been given an opportunity to explain but his responses to threshold questioning make further inquiry appear to be a futile exercise, a proper foundation has been laid. *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.

■■ Here, prior to calling Catherine Ferris in rebuttal, defendant was asked during cross-examination whether she had been involved in an automobile accident in February 1975. Although she initially could not remember such an event, she eventually admitted that while driving in February 1975, her vehicle was struck by a truck, that three passengers were in the car, and that thereafter she and the passengers went to the hospital on the advice of the police. She denied either having been injured in an accident or having made a statement to hospital personnel or anyone else that she had been injured. Ms. Ferris, who with her two children were defendant's passengers in the February accident, testified that defendant complained of injuring her head. While the trial court apparently considered that it would have been a futile exercise to have required the additional foundation question as to whether defendant complained to Ms. Ferris, we believe that is should have been asked. However, it appears to us that the Ferris testimony accomplished no more than did the stipulation of defendant that X rays were taken of her head after the February accident. This would indicate complaints concerning her head and, in view thereof, we believe that any error because of a foundation lack could only be viewed as harmless.

Defendant's last contention is that her sentence was excessive in view of

her background and the nature of the offense. The State, however, argues that the sentence was within statutory limitations and befits the violent nature of the offense.

Voluntary manslaughter is a Class 2 felony (Ill. Rev. Stat. 1975, ch. 38, par. 9—2) for which the Unified Code of Corrections provides "the minimum term shall be 1 year unless the court, having regard to the nature and circumstances of the offense and the history and character of defendant, sets a higher minimum term, which shall not be greater than one-third of the maximum term set in that case by the court." Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—1.

■■ The authority of a reviewing court to reduce a sentence should be applied with considerable caution and should not be utilized unless the sentence is greatly at variance with the purpose and spirit of the law or extemely disproportionate to the nature of the crime (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634), and a court of review will not set aside a sentence unless it is clear from the record that there was a manifest abuse of discretion (*People v. Dorsey* (1976), 41 Ill. App. 3d 313, 354 N.E.2d 510). In evaluating the propriety of the imposition of a greater than minimum sentence, a court of review may consider the statement of the trial court at the time of sentencing as well as the record as a whole. (*Houck.*) However, an appellate court is not at liberty to disturb a sentence merely because it might have imposed a different term had it been sitting as the trier of fact. *People v. Mercer* (1976), 41 Ill. App. 3d 1051, 355 N.E.2d 234. See also *People v. Pardue* (1977), 46 Ill. App. 3d 845, 361 N.E.2d 383.

■■ Here, the trial court in imposing a sentence of three to nine years addressed itself particularly to defendant's conduct in taking the life of another, which the court felt not only bespoke the seriousness of the offense but also the character of defendant. We note also that the court inquired of defendant's relatives concerning the future of defendant's nine-year-old daughter and the manner in which it would be accomplished. Viewing the totality of all the circumstances, we cannot say that the court abused its discretion in the sentence imposed, even considering defendant's lack of a prior criminal record and the stimuli that motivated her conduct.

For the reasons stated, the judgment is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.